Irving **MACHLEDER** and **Flexcraft Industries, Inc.,** Plaintiffs,

v.

Arnold **DIAZ, CBS Inc., WCBS–TV, Ann Sorkowitz and John Does 1 through 3,** Defendants.

No. 79 Civ. 4373 (KTD).

United States District Court,
S. D. New York.

April 17, 1982.

Wien, Lane & Malkin, New York City, for plaintiffs; Robert A. Machleder, New York City, of counsel.

Coudert Brothers, Ronald E. Guttman, Associate Gen. Counsel, New York City, for defendants; Carleton G. Eldridge, Jr., Pamela Ostrager, John M. Keene, III, Peter M. Nelson, Theodore S. Green, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

In this diversity action alleging defamation, invasion of privacy, assault and battery, and trespass, defendants move for summary judgment. Plaintiffs cross-move for summary judgment on one of its defamation claims and on its trespass claim. In addition, both parties move for costs and attorneys' fees incurred in responding to each others motion.

This action results from the broadcast on WCBS–TV of an encounter on May 22, 1979 between defendant Arnold Diaz, then WCBS–TV's New Jersey investigative correspondent, and Irving Machleder, president of Flexcraft Industries, Inc. ("Flexcraft") on the property of Flexcraft in Newark, New Jersey. Flexcraft is a New Jersey corporation which manufactures industrial adhesives and coatings, chemical products and arts and crafts materials at its building in Newark.

Certain facts about the events of May 22 are undisputed. Acting on a tip received that day from an unidentified person, Diaz went to a lot in Newark, New Jersey adjacent to the Flexcraft building with a film crew to investigate reported dumping of chemical wastes. When he arrived at the lot, Diaz saw several large drums strewn about. The drums were marked with labels that said "hazardous" and "flammable." After walking around and examining the barrels, Diaz and the film crew approached the neighboring building with the belief that the abandoned chemical barrels were on Flexcraft property. Diaz was unaware at the time that the lot on which these drums lay was in fact owned by the Newark Housing Authority. Diaz walked to a side door of the building. An issue of fact exists as to whether Diaz actually entered the doorway. Diaz claims that he and his crew did not enter it but stood outside while the cameraman took a picture of an area 8 to 10 feet inside the building that was illuminated by the camera's lights. Immediately, Bruce Machleder, who is the son of the plaintiff Irving Machleder and who was working in the area near the doorway, asked Diaz and his crew to stop filming and to leave because several of the company's trade secrets were within plain view. Bruce alleges that Diaz was actually inside the building at this time. Diaz then inquired: "can you tell me about the drums in the back," and Bruce replied that Diaz should go around to the office at the front of the building.

As Diaz and his crew walked to the front of the building, Diaz noticed a man walking away from the building who Diaz presumed to be a member of the Flexcraft management. Cameras rolling, Diaz approached the man, who turned out to be Irving Machleder, and asked him if he knew anything about the dumped chemical barrels. Machleder said that he did not want to be filmed for television and advised Diaz to call the "housing department." Diaz persisted and moved his microphone closer to Machleder in an attempt to elicit a response. Machleder became agitated and turned back to his office. Diaz and his crew followed him. Machleder claims, and defendants deny, that during this time one of the members of the camera crew jabbed him in the ribs. Once Machleder was back in his office with the door closed, Diaz came in. According to Diaz, he was invited in by Bruce Machleder who answered several questions posed by Diaz off-camera. Bruce explained to Diaz that Flexcraft had reported the abandoned chemical barrels to the authorities.

Diaz then returned to his car and called his researcher Ann Sorkowitz at the WCBS–TV offices in New York on his car's two-way radio. He asked her to call the Newark Housing Authority ("NHA"), the United States Coast Guard ("USCG") and the New Jersey Turnpike Authority ("NJTA") to confirm Bruce's assertion that Flexcraft had reported the dumping and to obtain any additional information about the barrels.

Diaz then went to the Newark City Hall to speak with officials at the Mayor's office and the Fire Department. He subsequently returned to the lot next to Flexcraft to find Newark Deputy Fire Chief Joseph McLaughlin inspecting the dumpsite. Diaz interviewed Deputy Chief McLaughlin on camera and then returned with his crew to the WCBS–TV news studio in Manhattan. There, Ms. Sorkowitz told Diaz that Flexcraft had reported the chemical dumping to both USCG and NJTA. Apparently, NHA did not return Ms. Sorkowitz's call that afternoon.

Later that evening, the following news report was aired by WCBS–TV on its Six O'Clock News program:

JIM JENSEN: Barrels of chemicals haphazardly strewn in an Elizabeth, New Jersey field depot—it is a nightmare which Arnold Diaz started telling you about five months ago. This evening Arnold has an exclusive report on yet another case of chemical waste discarded without care in New Jersey. Arnold . . . .

ARNOLD DIAZ: Thanks, Jim. Yesterday I got a call from a viewer who asked to remain anonymous. "Diaz", he said, "while you're investigating the chemical dumping problem, go take a look in Newark on Avenue P." So I went there today, and here's the result.

Just off the Turnpike, in an area full of oil refineries and chemical companies I found the spot—527 Avenue P in Newark. I saw hundreds of drums of chemical waste that had been dumped there and left to rot. On the drums were labels, like "flammable", "hazardous." I went further back among the drums and found many that had rusted, the contents spilling onto the ground, and, even worse, spilling into a waterway that runs behind the land. The slimy green water reeked of the noxious odor of chemicals.

Now, just who owns these barrels, what's inside of them and how they got there I really don't know. But I do know there is a small business on the property over there, and I went inside to try to get some answers. So I went to the office of Flexicraft [sic], a company that uses chemicals to make art supplies, and found the manager outside.

FLEXICRAFT [sic] MANAGER: "Get that damn camera out of here."

ARNOLD DIAZ: "Sir ___ sir ___"

FLEXICRAFT [sic] MANAGER: "I don't want to be involved with you people . . . . ."

ARNOLD DIAZ: "Just tell me why—why are those chemicals dumped in the back . . . ."

FLEXICRAFT [sic] MANAGER: "I don't want ___ I don't need __ I don't need any publicity . . . ."

ARNOLD DIAZ: "Why are the chemicals dumped in the back?"

FLEXICRAFT [sic] MANAGER: "We don't __ we didn't dump 'em."

ARNOLD DIAZ: "Who did?"

FLEXICRAFT [sic] MANAGER: "You call the Housing Department. They have all the information."

ARNOLD DIAZ: The manager told me off camera that for years the city has known all about the problem of chemical dumping on the land. So I went to City Hall, where the Mayor's Assistant said the Fire Department would check out the problem immediately. And when I got back to the scene, there they were, trying to find out what's in the barrel.

DEPUTY CHIEF J.\ McLAUGHLIN, NEWARK FIRE DEPARTMENT: "Well, it looks like the residue of a manufacturing plant that put out a lacquer or a paint base of some kind."

ARNOLD DIAZ: "And is it a threat to safety?"

DEPUTY CHIEF J. McLAUGHLIN: "I'm fairly sure there's a hazard there. Whatever material hasn't been dried out, and there'd be enough solvent in there to create a hazard if the drum was heated to the right point."

ARNOLD DIAZ: "It could explode?"

DEPUTY CHIEF J. McLAUGHLIN: "The drum would explode, and somebody could be sprayed."

ARNOLD DIAZ: Late this afternoon I was able to confirm that the owner of Flexicraft had told State and Local authorities about the illegal dumping two years ago, and nothing' been done [sic]. The City of Newark says the State should clean it up. The State says they're investigating, but it's not necessarily their responsibility, because the Newark Housing Authority owns the lands. So the drums still sit there—still leaking. Jim . . . . (Diaz Affidavit, Exh. B)

This report was not aired on the television station's Eleven O'Clock News program.

What the dry transcript of the report does not show is the reaction of Irving Machleder when Diaz and the film crew approached him. A video tape of the aired report and of the unedited film of Diaz's interviews were provided to the court. The film clearly shows an agitated Irving Machleder.

The complaint alleges (1) that Sorkowitz slandered Flexcraft when she called the various authorities, and that Diaz and CBS libeled plaintiffs on the May 22, 1979 news program; (2) that Diaz's activities constitute an invasion of privacy; (3) that members of the camera crew are liable for assault and battery because they jabbed plaintiff Machleder in the ribs; and (4) that Diaz and the camera crew trespassed on plaintiffs' property.

Defendant has moved for summary judgment on all of plaintiffs' claims. Plaintiffs have cross-moved for summary judgment on the slander claim involving Ms. Sorkowitz and the trespass claim. For the following reasons, plaintiffs' motions are denied, and defendants' motions are granted in part only.

1. *Choice of Law*

■ Resolution of the motions before me requires a determination of whether New York or New Jersey law applies to plaintiffs' claims. The parties agree that the claims for assault and battery and trespass are governed by the law of New Jersey. A question exists, however, over which law applies to the libel, slander and invasion of privacy claims. Because this diversity action was brought in New York, New York's conflict of law rules will be applied to resolve this issue. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Mattox v. News Syndicate Co., Inc.*, 176 F.2d 897 (2d Cir.) (L. Hand), *cert. denied*, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949).

■ Under New York law, courts apply the substantive tort law of the state which has the "most significant relationship with the occurrence and with the parties." *Babcock v. Jackson*, 12 N.Y.2d 473, 484, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279, 288 (1963); *Mattox v. News Syndicate Co., supra*, 176 F.2d at 900. Here, the allegedly libelous news report depicted an encounter which took place in New Jersey. The report was part of a series prepared by defendant CBS' New Jersey reporter, Arnold Diaz, and was aired throughout Northern New Jersey and the tri-state New York City metropolitan area. Defendant Ann Sorkowitz's allegedly defamatory statements were made to New Jersey public officials. In addition, plaintiff Irving Machleder is a citizen and resident of New Jersey and plaintiff Flexcraft is a New Jersey corporation with its principal place of business in New Jersey. Plaintiffs claim that as a result of defendants' allegedly defamatory statements, plaintiffs suffered damages to their business in New Jersey.

In spite of these significant contacts with the New Jersey forum, defendants claim that New York's law should apply because New York is the defendants' principal place of business as well as the place where the

news report was conceived, edited and broadcast. Defendants claim that New York has a stronger interest than New Jersey in "protecting and fostering a vigorous news media" (Defendants' Brief p. 15) and thus urge that New York law should apply.

■ The Supreme Court's decisions in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), placed new emphasis on the importance of considering First Amendment rights of media defendants in defamation cases. However, in *Gertz*, the Court also reaffirmed a state's interest in protecting its private citizens from defamatory falsehoods. *Gertz, supra,* 418 U.S. at 341, 94 S.Ct. at 3008. *Gertz* permits states to establish their own standards of fault, short of strict liability, necessary to find a media defendant liable for defamatory statements about a private person. Therefore, despite the interest of New York in establishing a standard of fault for its news media, New Jersey also has an important competing interest in protecting its citizens from defamation. Coupled with New Jersey's additional interest in governing the fault of those who come within its boundaries to investigate the news and later broadcast it there, these factors call for the application of New Jersey law.

For these same reasons, New Jersey bears the "most significant relationship" to plaintiffs' claims of invasion of privacy, and accordingly its law will apply to these claims as well. *See Nader v. General Motors Corporation*, 25 N.Y.2d 560, 565, 307 N.Y.S.2d 647, 651, 255 N.E.2d 765, 769 (1970).

## 2. *Defamation*

### a. The News Broadcast

Plaintiffs' first count alleges that the defendants' broadcast on May 22, 1979 contained a report which was defamatory. Plaintiffs claim that the report depicted plaintiffs as being responsible for the chemical dumping. It did this by making outright false statements, such as identifying

the dump site as "527 Avenue P"—the address of Flexcraft—and by presenting the report in such a way that the language and composition of the television broadcast taken as a whole inferred that plaintiffs dumped the chemical barrels.

■ New Jersey generally adopts the definition of defamation found in the Restatement (Second), Torts, Section 559 (1977) which states:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him.

*See Cibenko v. Worth Publishers, Inc.*, 510 F.Supp. 761 (D.N.J.1981); *see also Rogozinski v. Airstream By Angell*, 152 N.J.Super. 133, 377 A.2d 807 (Super.Ct.Law Div.1977), *aff'd*, 164 N.J.Super. 465, 397 A.2d 334 (Super.Ct.App.Div.1979).

■ Whether or not the broadcast "can reasonably be construed as defamatory is a question for the Court in the first instance." *Cibenko v. Worth Publishers, Inc., supra,* 510 F.Supp. at 764 *citing* Restatement 2d, Torts, Section 614, Comment b (1977); *Lawrence v. Bauer Publishing & Printing Ltd.*, 176 N.J.Super. 378, 392, 423 A.2d 655, 662 (Super.Ct.App.Div.1980). The standard followed in *Cibenko* is whether, taking the broadcast as a whole, a recipient "correctly, or mistakenly but reasonably, understands" the statement in a light which would make it defamatory with respect to the plaintiff.

Can the report reasonably be interpreted to portray falsely the plaintiffs as illegal chemical dumpers? Three parts of the report, (i) the implication that the dumping occurred on the plaintiff's land, (ii) the portrayal of plaintiff Machleder's anger as a defensive and guilty response to Diaz's questions about the dumping rather than an angry response to being confronted with television cameras, and (iii) the fire chief's statement that the contents of the barrels consisted of by-products of paint and lacquer (items manufactured by the plaintiffs), placed in juxtaposition to each other, could, according to plaintiffs, reasonably lead a viewer to believe that plaintiffs were re-

sponsible for the dumping. However, the report also stated and confirmed that plaintiffs had reported the dumping to the proper authorities years earlier. In addition, Diaz corrected himself about the address of the dumpsite by saying that the barrels were strewn on property owned by the Newark Housing Authority. Nevertheless, after viewing the videotape of the report as a whole, I believe that it could lead a reasonable person to conclude that plaintiffs dumped the chemicals. This conclusion is buttressed by the affidavit of a viewer of the Diaz news report, James Kulpa, who states that "[f]rom the broadcast of May 22, 1979 it appeared to me that Mr. Machleder and Flexcraft were involved in dumping chemical wastes into a waterway on the Flexcraft property and that they were in some way involved with Chemical Control." (Kulpa Affidavit ¶ 2) Although Mr. Kulpa is a longstanding friend of Mr. Machleder his statement cannot be dismissed out-of-hand but must await deliberation by the trier of fact.

■ The next question to be resolved is whether the defendants acted with the requisite degree of fault in their news broadcast about the plaintiffs. Again, it appears that New Jersey follows the Restatement on this point. *See Rogozinski, supra*, 152 N.J.Super. at 145–46, 377 A.2d at 813. The Restatement, Torts 2d Section 580 B (1977) provides:

> One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
> (a) knows that the statement is false and that it defames the other,
> (b) acts in reckless disregard of these matters, or
> (c) acts negligently in failing to ascertain them.

Comment C to this section, "Effect of the Constitution," provides:

> In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789]

(1974), the Supreme Court specifically held that the First Amendment to the Constitution does not permit the imposition of "liability without fault" on "a publisher or broadcaster of defamatory falsehood injurious to a private individual". Aside from this restriction, the Court said, the States may define for themselves "the appropriate standard of liability". The strict liability of the common law has thus been expressly ruled unconstitutional. A significant measure of fault on the part of the defendant in regard to the falsity of the communication is required. Obviously, knowledge of falsity or reckless disregard as to it is sufficient. It is clear that negligence will likewise meet the constitutional requirement, although a lesser degree of fault probably would not. In view of the constrained change from the common law strict liability, it is natural to conclude that the revised common law rule of defamation will be that a defendant is liable either for negligence or for some greater fault.

In New Jersey, the degree of "fault" required after *Gertz* has been tied to the common-law qualified privileges. *See Rogozinski, supra*, 152 N.J.Super. at 145–46, 377 A.2d at 819. In *Rogozinski*, the court found that where a qualified privilege exists, a showing of *express malice* is a prerequisite to imposing liability for defamation. There is no common-law qualified privilege, however, for the news media in publishing defamatory statements about private citizens. Therefore, it is not clear whether New Jersey would adopt the *Rogozinski* standard under the circumstances of this case.

■ Following the letter of the Restatement, which has been the consistent approach of New Jersey courts, liability may be imposed at the very least on a defendant who "knows that the statement is false and that it defames the other ...." Restatement Torts, 2d Section 500B(a). *See also, id.* Section 600. Evidence must exist to permit the conclusion that the defendants

entertained serious doubts as to the truth of the publication. *See Marchiano v. Sandman*, 178 N.J.Super. 171, 428 A.2d 541 (Super.Ct.App.Div.1981). This standard is considerably higher than the post-*Gertz* standard of fault found in many jurisdictions, including New York.[1] Even under this stricter standard, however, the record before me indicates substantial questions of fact concerning defendants' knowledge that their presentation was false.

The Diaz report, without question, involved a subject of public interest. Prior to the May 22 broadcast, local chemical dumping was an obvious problem of great magnitude in New Jersey. Earlier that same year defendants broadcast four reports on various chemical waste problems in New Jersey which posed imminent health hazards to its citizens. Cohen Affidavit Exhs. A, B, C, D. Also, the print media reported extensively on the chemical waste problem in New Jersey. *See* Keene Affidavit. When reporting on such areas of public concern, the news media are to be afforded great leeway. The Supreme Court in *Gertz*, however, expressly acknowledged the competing interests of states "in compensating injury to the reputation of private individuals . . . ." 418 U.S. at 343, 94 S.Ct. at 3009. Mr. Machleder is a private individual. Perhaps the clearest evidence of this is the fact that Diaz had no idea who Mr. Machleder was before he approached him with questions. Accordingly, Mr. Machleder is enti-

tled to be compensated for injury to his reputation provided the defendants have acted with the requisite degree of culpability.[2]

The undisputed facts in the case show that defendants conducted an investigation over several hours to gather information on which to base their short program. Prior to broadcasting it, the defendants examined the dump site, interviewed (or at least attempted to interview) the Flexcraft managers and talked to several local, state and federal officials about the abandoned barrels. Despite this background, the defendants presented their broadcast in what could be described as a defamatory matter; i.e., implying that Flexcraft was responsible for the dumping. Evidence in the record exists to show that this implication may not have been far from defendants' minds when they edited the program for presentation. Stephen J. Cohen, the News Director of WCBS–TV, described in part the decision to show Machleder's agitated response to Diaz' questions in the program as follows:

> I have come to believe that a bare denial of complicity in a situation like this by someone close enough to it geographically or situationally to logically have had the opportunity to have information about it, is simply not a sufficient response to reporter's questions.

(Cohen Affidavit ¶ 19)

---

1. The parties have not offered, and this court has been unable to locate, any New Jersey case which specifically addresses the degree of "fault" required in a case involving a private plaintiff and a media defendant. In Maryland (whose state law a New Jersey court looked to in determining a post-*Gertz* standard where a qualified privilege existed. *Rogozinski, supra.*), a negligence standard is used. *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976). Several other states have adopted an actual malice standard. *See* Sack, Libel Slander and Related Problems 250 (1980) and cases cited therein. Under New York law, "where the context of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover. [if] . . . the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and

dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y. S.2d 61, 64, 341 N.E.2d 569, 571 (1975). This New York standard appears to require a level of culpability somewhere between malice and negligence.

2. The corporate plaintiff may have to be considered on a different footing. Because it is regulated under state law it may be considered public; also, if the company's equity is traded publicly this too may affect Flexcraft's "private" status. As a public figure it would be subject to the *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) standard of "actual malice." As will be discussed, *infra*, New Jersey appears to apply the same standard for both "private" and "public" persons.

Thus, Cohen may have shown Machleder's angry response in order to create the very impression which plaintiffs argue is defamatory, to wit, that because the president of the company whose land is situated next to a chemical dump site does not wish to answer the reporter's questions and becomes agitated when asked these apparently accusatory questions, he must be in some way responsible for the presence of the chemical wastes. The video tape of the news program could be interpreted to show Machleder as evasive, guilty, and the anonymous dumping culprit. The fact that the defendants excised from their broadcast statements by Chief McLaughlin that the situation presented no hazard and that the dumping did not originate locally indicate that the defendants may have deliberately created this false impression of the plaintiff Machleder. It is true that defendants aired Machleder's disclaimer and a statement by Diaz that he did not know who dumped the chemicals. Diaz also stated on the program that the property was owned by the Newark Housing Authority, not Flexcraft. Despite these facts, a jury might reasonably find that defendants intentionally presented the false impression that Machleder was responsible for the dumping.[3]

 I am cognizant of the general acceptance of summary judgment in defamation cases in the interests of protecting first amendment rights of media defendants. *See Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042 (S.D.N.Y.1975), aff'd, 538 F.2d 309 (2d Cir. 1976); *Meeropol v. Nizer,* 381 F.Supp. 29, 32 (S.D.N.Y.1974), aff'd, 560 F.2d 1061 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *see also, Washington Post v. Keogh,* 365 F.2d 965 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). None of these cases suggest, however, that where genuine issues of fact are present, especially as to the degree of de-

fendants' fault, summary judgment is appropriate. *See Yiamouyiannis v. Consumers Union of United States,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839 (1980) ("Defamation actions are to be treated no differently from other actions."); *see also, Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978). Accordingly, defendants' motion for summary judgment on the libel claim is denied.

b. Sorkowitz's Statements

Plaintiffs also claim that defendant Ann Sorkowitz, Diaz's assistant, made defamatory statements to New Jersey public officials accusing plaintiffs of involvement in the illegal dumping. The affidavits of two government officials state that Sorkowitz asked something to the effect that "were you aware that Flexcraft was dumping chemical wastes in New Jersey." (Ruezel and Olarsch Affidavits). Defendants do not seriously dispute the assertion that such statements were made. Instead, defendants seek to dismiss this claim on the grounds that Sorkowitz's communications were made in the public interest on an "occasion when it was [her] duty to speak ... in protection of some common interest," and thus were conditionally privileged. *Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 374, 149 A.2d 193, 202 (1959); *Cashen v. Spann,* 125 N.J.Super. 386, 406, 311 A.2d 192, 203 (Super.Ct.App.Div.), aff'd, 66 N.J. 541, 334 A.2d 8 (1973), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975).

 Ms. Sorkowitz is entitled to invoke this conditional privilege only if she used the occasion (of calling the public officials) to protect "some common interest." *Coleman v. Newark Morning Ledger Co., supra,* 29 N.J. at 374, 149 A.2d at 202. However, any conditional privilege she is entitled to is destroyed in the presence of express malice or bad faith. *Jorgensen v.*

---

**3.** Defendants have not argued in any way that this defamatory meaning was an expression of an opinion by the defendant and therefore protected under the First Amendment. I believe that the investigative context in which the report was presented precludes a reasonable per-

son from believing that it was anything other than a presentation of "facts". It was not a commentary on undisputed facts. *Compare Cibenko v. Worth Publishers, Inc.,* 510 F.Supp. 761, 765 (D.N.J.1981).

*Penn R. R. Co.*, 25 N.J. 541, 566, 138 A.2d 24, 38–39 (1958). If Ann Sorkowitz had full knowledge of the untruthfulness of her statements at the time she allegedly made them, then any rights to the privilege are forfeited. *See Coleman v. Newark Morning Ledger, supra*, 29 N.J. at 374–75, 149 A.2d at 203; *Dijkstra v. Westerink*, 168 N.J.Super. 128, 135, 401 A.2d 1118, 1121 (Super.Ct. App.Div.1979). If she had a mixed motive, including one "different from that which *prima facie* rendered the communication privileged," she can also forfeit any privilege if that different motive is found to be "contrary to good morals." *Jorgensen v. Penn R. R. Co., supra*, 25 N.J. at 568, 138 A.2d at 39–40.

■ The burden of proving a forfeiture of privilege is on the plaintiff. *Cashen v. Spann, supra*, 125 N.J.Super. at 406, 311 A.2d at 203, and plaintiffs' evidence has to be unequivocal in order to defeat a summary judgment motion. *Id.* at 406, 311 A.2d at 203.

■ Ms. Sorkowitz's deposition testimony indicates that she intended to make inquiries as to whether Flexcraft had informed government agencies of the dumping. She also stated that she had no reason to believe Flexcraft was responsible for the dumping. Thus, the defamatory statements she allegedly made seem to bear no relation to the purpose of her call and may be unprivileged. Material issues of fact exist as to whether Ms. Sorkowitz also intended to alert officials of the dumping in the public interest; whether this entitles her to a conditional privilege; whether she in fact made slanderous statements, and whether she had made those statements recklessly or with malice. Thus, summary judgment on this claim is denied.

### 3. *Invasion of Privacy*

■ In the second count of their complaint, plaintiffs claim that defendants invaded Mr. Machleder's right of privacy.

New Jersey permits the common law privacy actions recognized in the Restatement (Second) of Torts, Section 652. *Devlin v. Greiner*, 147 N.J.Super. 446, 462, 371 A.2d 380, 389 (Super.Ct.Law Div.1977). Three of the four types of common law privacy actions are at issue here. Plaintiffs claim that defendants (1) intruded upon plaintiff Machleder's seclusion, (2) publicized Machleder's private life, and (3) publicized him in a false light by inducing his anger and then portraying him as intemperate and evasive, thereby implying he was responsible for the chemical dumping.

■ The two major elements of intrusion upon seclusion, as described in the Restatement (Second) of Torts, Section 652B, are (1) something private which has been intruded upon, and (2) an intrusion which is "highly offensive."[4] Machleder was accosted and filmed in a semi-public area, and he was visible to the public eye. Diaz's questioning, although aggressive and possibly abrasive, occurred in one encounter with plaintiff and does not constitute unabated hounding of the plaintiff. Thus, defendant is not liable for intruding upon plaintiff's seclusion. Restatement (Second) of Torts, Section 652B, Comment c and d.

■ Similarly, plaintiffs' claim for improper publicity given to his private life must be dismissed. Defendants' purported reason for broadcasting the film of Machleder's angry reaction was that such a reaction to questions about dumping is of public concern. In fact, it appears Machleder's anger may have had more to do with the presence of the cameras than the substance of the reporter's questions. Although the portrayal of Machleder's angry reaction is of doubtful concern to the public, and arguably intrusive, the encounter took place in a semi-public area while plaintiff knew the cameras were rolling. Defendant is subject to no liability for giving further publicity to that which plaintiff leaves open to the public eye. Restatement (Second) of Torts, Section 652D, Comment b.

4. This part of plaintiffs' claim, unlike the other two for invasion of privacy, does not depend upon publicity. Restatement (Second) of Torts, Section 652B, Comment a. Thus, the intrusion under consideration is not the publicizing of plaintiff's reaction to defendant's confrontation but rather the defendant's act of confrontation itself.

Plaintiffs' claim for false light invasion to his privacy merits different consideration. Under New Jersey law, false light invasion of privacy is a cause of action separate from a defamation claim. *Devlin v. Greiner, supra,* 147 N.J.Super. at 463, 371 A.2d at 390; *Cibenko v. Worth Publishers, supra,* 510 F.Supp. at 766. The two requirements of false light invasion of privacy are (1) a highly offensive publication, and (2) knowledge or reckless disregard by the actor as to the falsity of the publicized matter and the false light in which the subject would be placed. It is not necessary that the publication be found to be defamatory in order to have invaded plaintiffs' privacy under this claim. *Cibenko, supra,* 510 F.Supp. at 766.

Defendants' alleged portrayal of Machleder as intemperate and evasive in response to Diaz's questions cannot be deemed inoffensive as a matter of law. Machleder asserts that his reactions were not evasive but resulted from Diaz's provocative manner of asking questions and from the presence of the cameras. If plaintiffs' contentions are found to be true, and defendants' portrayal of Machleder is found to be a knowingly false depiction of him as intemperate and even guilty of dumping, then defendants may be liable for false light invasion of privacy. The record before me certainly does not rule out these possible findings, and accordingly summary judgment for this claim is denied.

### 4. *Assault*

Plaintiffs allege that during the encounter with Machleder one of the CBS cameramen struck Machleder forcibly. Under New Jersey law "violence and force are synonymous when used in relation to assault and includes any application of force even though it entails no pain or bodily harm and leaves no mark." *Falconiero v. Maryland Cas. Co.,* 59 N.J.Super. 105, 106, 157 A.2d 160, 162 (Camden County Ct.1960).

**5.** Plaintiffs also claim that valuable trade secrets were wrongfully photographed. Since both Irving and Bruce Machleder agree that any secrets allegedly filmed could not be clear-

Thus, if it is found that the cameraman touched Machleder in an offensive way to move him into the picture, as has been alleged, he has committed a technical assault even though Machleder suffered no bodily harm. *See Rullis v. Jacobi,* 79 N.J. Super. 525, 192 A.2d 186, (Super.Ct.Ch.Div. 1963). Defendants allege that any alleged touching was inadvertent. This raises a material issue of fact, and summary judgment on this count is therefore denied.

### 5. *Trespass*

Count IV of the complaint alleges that defendants wrongfully trespassed upon Flexcraft's property. License to enter someone's property may be implied from a general understanding or practice. *See McKee v. Gratz,* 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922). Defendants' entrance onto plaintiffs' property was not forcible and there were no signs warning visitors to keep off the property. It is uncontroverted that Bruce Machleder met the defendants and instructed them to proceed to the building's office. Although Bruce purportedly told Diaz to leave the doorway to the side door of the Flexcraft building, at no time did Bruce tell the defendants to leave the entire premises. His actions implied his consent to the defendants' remaining on the lot. In front of the office, defendants encountered Irving Machleder. Although Machleder expressed anger at being filmed, he did not tell defendants to leave the property. To the contrary, at the close of the encounter, defendants were still able to obtain an interview with Bruce Machleder on Flexcraft property. This constitutes implied permission to remain on the property. This implied consent to be on plaintiffs' property precludes liability for trespass. *See Snyder v. I. Jay Realty Co.,* 30 N.J. 303, 153 A.2d 1 (1959). Summary judgment dismissing this claim is granted.[5]

ly read when viewed on an ordinary TV screen and plaintiffs do not claim that Arnold Diaz or CBS were interested in appropriating any trade secrets, this claim is dismissed as baseless.

Both plaintiffs and defendants have asked for attorneys' fees and costs for this motion. Since neither sides' arguments are totally baseless, both requests are denied. *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980).

Defendants' motion for summary judgment for Counts I, II and III is denied. Summary judgment on Count IV in favor of defendants is granted.

Plaintiffs' cross-motion for summary judgment for Counts I and II is denied.

SO ORDERED.