883 A.2d 1008

**Parren J. MITCHELL**

v.

**BALTIMORE SUN COMPANY, Walter F. Roche, Jr., Ivan Penn.**

**No. 266, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 29, 2005.

498

500

Larry S. Gibson (Arthur M. Frank on the brief), Baltimore, for appellant.

Jay W. Brown (Michael D. Sullivan, Jeanette M. Bead, Levine Sullivan, Koch & Schulz, LLP on the brief), Washington, DC (Stephanie S. Abrutyn on the brief), New York, NY, for appellee.

KENNEY, DEBORAH S. EYLER and RAYMOND G. THIEME (Retired, specially assigned) JJ.

KENNEY, J.

Parren J. Mitchell appeals the judgment of the Circuit Court for Baltimore City granting summary judgment to the Baltimore Sun Company, Walter F. Roche, Jr., and Ivan L. Penn (collectively, "appellees") on his claims of trespass, intrusion upon seclusion, and intentional infliction of emotional distress. He poses one question, which we have reworded and recast as follows:

I. Did the circuit court err in granting summary judgment on the trespass count?

II. Did the circuit court err in granting summary judgment on the intrusion upon seclusion count?

III. Did the circuit court err in granting summary judgment on the intentional infliction of emotional distress count?

For the following reasons, we answer "yes" to questions one and two, and "no" to question three.

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2002, Walter F. Roche, Jr. and Ivan L. Penn, both reporters for the Baltimore Sun Company ("Baltimore Sun"), were informed that various bills incurred in the name of former Congressman Parren Mitchell were not being paid.

Investigating the report further, Roche and Penn discovered, through public documents, that several creditors had obtained judgments and liens against former Congressman Mitchell as a result of outstanding debts. Believing that news of the former Congressman's financial difficulties was of interest to the public, Roche and Penn decided to write a news article on the matter.

They considered it important to their story to interview Congressman Mitchell. Aware that he was living at the Keswick Multi–Care Center ("Keswick"), the reporters decided to visit him on May 29, 2002. Although they were also aware that he was elderly and in failing health, neither reporter attempted to contact the Congressman, his family, or Keswick prior to their visit.

On May 29, 2002, Roche and Penn arrived at Keswick at approximately 6:45 p.m., during regular visiting hours. Entering the building, neither reporter saw signs stating: "SECURITY NOTICE All Visitors Must Report to Reception" or "NO TRESPASSING NO SOLICITING." Inside, Penn signed his name in a book at the reception/security desk and wrote that he was visiting "Parren Mitchell." Roche did not sign the book, later stating that he thought it unnecessary for both he and Penn to sign in. While at the security/reception desk, the security person/receptionist did not instruct the reporters as to any sign-in procedure, did not ask them any questions, including their identities, and did not request Roche to sign in. Neither of the reporters informed the person at the desk of the purpose of their visit, nor were they wearing anything to identify themselves as reporters.

After passing the security/reception desk, Roche and Penn walked to Congressman Mitchell's room. According to them, the door to his room was open and there was no sign on his door indicating that visitors were restricted from entering. Standing outside of Congressman Mitchell's room, Roche and Penn claimed that the Congressman had been speaking to his private duty nurse, Ella Simpson. They waited for a lull in the conversation before entering.

The reporters aver that, when they entered the room, the Congressman was sitting in his chair. They greeted him and identified themselves as reporters for the Baltimore Sun. They questioned the Congressman concerning bills that had not been paid and the recent purchase of a car by the Congressman's nephew, Michael Mitchell. Roche and Penn posit that Congressman Mitchell was receptive to the interview and answered their questions. Additionally, at no time during the interview did Simpson or any member of the Keswick staff ask the reporters to terminate the interview or leave the facility.

That version of events is supported by the affidavit of Simpson, who was Congressman Mitchell's private duty nurse.[1] According to Simpson, she was caring for the Congressman on May 29, 2002, between seven o'clock and eleven o'clock in the evening. At that time, there were no signs on the door indicating that visitors were restricted from entering, and in the past, the Congressman regularly received unannounced visitors. Early that evening, Simpson recalled that, while she was present, two men entered Congressman Mitchell's room and identified themselves as reporters for the Baltimore Sun. According to Simpson, she remained for the entire ten-minute interview. She remembered that Congressman Mitchell was receptive to the reporters' questions and "[a]t no time during the reporters' visit did [Congressman] Mitchell ask the reporters to leave his room or ask me to escort them from his room." In the past, Simpson recalled that, when the Congressman received unwelcome visitors, he would ask her to escort them out.

At the conclusion of the interview, Simpson recalled that she thanked the reporters for coming and that the Congressman did not appear upset or agitated by the visit or the interview. Following Roche and Penn's departure, Simpson remembered that the Congressman called his nephew, Michael Mitchell. At Michael Mitchell's request, the Congressman's vital signs were checked later that evening and they appeared normal.

---

1. On June 14, 2004, after providing an affidavit in this case, Simpson was shot and killed in a domestic dispute.

Congressman Mitchell's recollection of the events of the evening of May 29, 2002, is starkly different. According to the Congressman, he was alone in his room lying on his bed and preparing to take a nap when Roche and Penn entered unannounced and began questioning him regarding unpaid bills. He could not remember whether his door was open or closed at the time, but he assumed that it was closed "because he was taking a nap." He contends that the Baltimore Sun reporters did not identify themselves as such, but he "didn't have to ask them because when they told me why they were there, I knew that only one party was involved in that, and that was [t]he Sun Paper." He repeatedly asked the men to leave his room, but when they did not comply, the Congressman answered their questions regarding the outstanding bills and recent car purchase by Michael Mitchell.

In addition to asking questions, Congressman Mitchell asserts that one of the reporters looked through some files that he had in a filing cabinet, box, or on a desk near his bed. Shortly after the reporters began asking questions, Simpson came into the room. The Congressman recalled that at no time did Simpson or anyone from Keswick request that Roche or Penn leave his room.

Following the reporters' visit, Congressman Mitchell claims that he became "short of breath." He remembered, however, that he did not call the nurse's station on his floor and that he was not examined by any of Keswick's medical staff following the reporters' visit.

On June 7, 2002, Congressman Mitchell filed a lawsuit against the Baltimore Sun Company, Roche, and Penn in the Circuit Court for Baltimore City alleging Trespass (Count I), Intentional Infliction of Emotional Distress (Count II), and Invasion of Privacy/Intrusion Upon Seclusion (Count III). For relief, Congressman Mitchell sought $1,000,000 in damages for each Count and $750,000,000 in total punitive damages. Appellees timely filed an answer, and following extensive discovery, on February 2, 2004, appellees moved for

summary judgment with regard to all of Congressman Mitchell's claims.

A hearing was held in the circuit court on March 24, 2004. Ruling from the bench, the circuit court granted appellees' motion with regard to all counts. With regard to the trespass count, the court found that there was no dispute of material fact that Congressman Mitchell answered the reporters' questions and that Simpson was present during the entire interview. Pursuant to *Machleder v. Diaz*, 538 F.Supp. 1364 (S.D.N.Y.1982), which the circuit court found controlling, the Congressman's responses and Simpson's acquiescence constituted consent to the reporters' presence and an affirmative defense to trespass. Concerning the intrusion upon seclusion claim, the circuit court found that, because he voluntarily consented to answer the questions posed, Congressman Mitchell could not assert that the reporters' conduct was intrusive. Finally, with regard to the intentional infliction of emotional distress count, the court concluded that the reporters' conduct did not rise to the required level of "shock[ing] the public conscious." The following day, the circuit court issued an order to that effect. This timely appeal followed.

## STANDARD OF REVIEW

Under Maryland Rule 2–501(f), a court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." We review "a trial court's grant of a motion for summary judgment *de novo*." *Remsburg v. Montgomery*, 376 Md. 568, 579, 831 A.2d 18 (2003). *See also Todd v. Mass Trans. Admin.*, 373 Md. 149, 154, 816 A.2d 930 (2003); *Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707 (2002); *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443, 795 A.2d 715 (2002). "The trial court will not determine any disputed facts, but rather makes a ruling as a matter of law. The standard of appellate review, therefore, is whether the trial court was

legally correct." *Williams v. Mayor of Baltimore,* 359 Md. 101, 114, 753 A.2d 41 (2000) (internal citations omitted).

When reviewing a grant of summary judgment, we first determine whether a genuine dispute of material fact exists "and only where such dispute is absent will we proceed to review determinations of law." *Remsburg,* 376 Md. at 579, 831 A.2d 18. "In so doing, we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Id.* at 579–80, 831 A.2d 18.

The Court of Appeals has held that general denials and proffered facts, lacking detail and precision, are insufficient to defeat a properly plead motion for summary judgment. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737–38, 625 A.2d 1005 (1993) (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 7–8, 327 A.2d 502 (1974)). Instead, the party opposing a motion for summary judgment must present facts that are detailed and admissible in evidence. *Beatty,* 330 Md. at 737–38, 625 A.2d 1005. "[T]he mere presence of a factual dispute in general will not render summary judgment improper." *Remsburg,* 376 Md. at 579, 831 A.2d 18. As the Court explained in *Lippert v. Jung,* 366 Md. 221, 783 A.2d 206 (2001), "A dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Id.* at 227, 783 A.2d 206 (quoting *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)) (emphasis in *Lippert* ). "Where the record shows that there was no such genuine dispute as to any material fact necessary to resolve the controversy as a matter of law, and it is shown that the movant is entitled to judgment, the entry of summary judgment is proper." *Lynx,* 273 Md. at 8, 327 A.2d 502 (citing *Selected Risks Ins. Co. v. Willis,* 266 Md. 674, 296 A.2d 424 (1972)).

"Finally, [i]n reviewing [the circuit court's] decision to grant a motion for summary judgment, we evaluate 'the same material from the record and decide [ ] the same legal issues as the

circuit court.'" *Campbell v. Lake Hallowell Homeowners Ass'n,* 157 Md.App. 504, 518–19, 852 A.2d 1029 (2004) (citations omitted). We "uphold the grant of a summary judgment only on the grounds relied on by the trial court." *Id.* at 519, 852 A.2d 1029 (quoting *Ashton v. Brown,* 339 Md. 70, 80, 660 A.2d 447 (1995)).

## DISCUSSION

### I.

We first consider Congressman Mitchell's contention that the circuit court erred in granting appellees' summary judgment on his trespass claim. A trespass is a tort involving "an intentional or negligent intrusion upon or to the possessory interest in property of another." *Ford v. Baltimore City Sheriff's Office,* 149 Md.App. 107, 129, 814 A.2d 127 (2002). In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in his property; (2) through the defendant's physical act or force against that property; (3) which was executed without his consent. *Ford,* 149 Md.App. at 129, 814 A.2d 127. (citing Richard J. Gilbert & Paul T. Gilbert, *Maryland Tort Law Handbook* § 8.2 (3d ed.2000)). Because appellees do not argue otherwise, we will assume for purposes of this appeal that Congressman Mitchell had a sufficient possessory interest in the nursing home room to maintain a trespass claim for its intrusion.

The plaintiff need not demonstrate that the defendant's intrusion was committed with tortious intent, but must establish that the defendant consciously intended to do the "act that constitutes entry upon [the plaintiff's] real or personal property." *Baltimore Gas & Elec. Co. v. Flippo,* 112 Md.App. 75, 85, 684 A.2d 456 (1996), *aff'd,* 348 Md. 680, 705 A.2d 1144 (1998). Because the interference must be without the plaintiff's consent, consent, either expressed or implied, constitutes a complete defense, so long as the scope of that consent is not exceeded. *See Brazerol v. Hudson,* 262 Md. 269, 273, 277 A.2d 585 (1971) (noting that, where the plaintiff

gave permission for an intrusion upon real property, there was no "unauthorized entry and hence no trespass").

It is undisputed that, upon entering Keswick, Roche and Penn checked in at the security/reception desk, where Penn signed his name to a sign-in book and indicated that he was visiting with Congressman Mitchell. What occurred afterwards, however, is disputed. Roche and Penn claim that they lingered outside of the open door to the Congressman's room for a lull in the Congressman's conversation before entering. Upon doing so, the reporters contend that they identified themselves as reporters from the Baltimore Sun, cordially interviewed the Congressman, and left. This account is supported by Simpson's affidavit. In her affidavit, Simpson stated that she was present during the entire interview, that the Congressman was receptive to the reporters' questions, and that "[a]t no time during the reporters' visit did [Congressman] Mitchell ask the reporters to leave his room or ask [her] to escort them from the room."

In contrast, Congressman Mitchell claims that when Roche and Penn entered his room he was alone preparing to take a nap. He could not remember whether his door was open or closed. When the reporters began asking questions, he knew that they were from the Baltimore Sun. He claims that he repeatedly told the reporters to leave, but they continued asking questions. He answered their questions only "in an effort to defend himself and his family." He also witnessed one of the reporters "rifling" through some files that he had in a filing cabinet, in a box, or on a table near his bed. According to the Congressman, Simpson did not enter the room until after the reporters had questioned him and after he had asked them to leave. Congressman Mitchell does not dispute that Simpson did not ask Roche and Penn to leave the room.

On appeal and in support of their motion for summary judgment, appellees contend that, even if Congressman's Mitchell's deposition testimony were to be believed, their entry into the Congressman's room was consented to under three alternative theories, thus establishing an affirmative

defense to the Congressman's trespass claim. First, appellees claim that their entrance into the Congressman's room was consented to by custom, and therefore, they claim, it is of no consequence that they entered the Congressman's room uninvited and unannounced. Second, appellees assert that, even if their initial entry to the Congressman's room were considered a trespass, by subsequently answering their questions, Congressman Mitchell "impliedly consented to their presence, thereby converting them from possible trespassers to invitees." Third, appellees contend that Simpson, an employee of Congressman Mitchell's, expressly and impliedly consented to their presence, precluding Congressman Mitchell's trespass claim as a matter of law.

Finally, appellees concede that, if credited, Congressman Mitchell's assertion that one of the reporters "rifled" through his papers would exceed the scope of any consent given. They maintain, however, that neither we nor the circuit court are required to credit the Congressman's deposition testimony because it is incredible, "insubstantial and spurious."

### A. Implied Consent Through Custom.

Appellees contend that, even if they entered Congressman Mitchell's private nursing room unannounced and uninvited, their entry did not constitute a trespass because it is customary to do so. According to appellees, once they signed in at the security/reception desk, they were permitted to enter the room of any occupant whom they indicated in the sign-in book they intended to visit. In furtherance of that argument, appellees direct our attention to the fact that some of Congressman Mitchell's confidants visited him in his room unannounced and uninvited. Additionally, appellees assert that the Congressman's family desired him to have visitors.

As stated above, consent, whether expressed or implied, is a complete defense to a claim of trespass. *Brazerol,* 262 Md. at 273, 277 A.2d 585. The *Restatement (Second) of Torts* § 892 states:

(1) Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be

communicated to the actor. (2) If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.

*Id.* Comment d. to that section provides:

In determining whether conduct would be understood by a reasonable person as indicating consent, the customs of the community are to be taken into account. This is true particularly of silence or inaction. Thus if it is the custom in wooded or rural areas to permit the public to go hunting on private land or to fish in private lakes or streams, anyone who goes hunting or fishing may reasonably assume, *in the absence of a posted notice or other manifestation to the contrary*, that there is the customary consent to his entry upon private land to hunt or fish.

*Id.* (emphasis added).

■ While we are persuaded that the reporters' entrance to the common areas of the Keswick nursing facility was permitted and that they complied with the visitor regulations established by that facility, we are not persuaded that, as a matter of law, their unannounced entry into the private nursing room of one of Keswick's occupants was within the scope of customs prevailing in the community. Even if we assume that the door to Congressman Mitchell's room was open when Roche and Penn entered, we are not persuaded that it is customary to enter such a room without the visitor first announcing his or her presence and requesting permission to enter.

■ On May 29, 2002, Congressman Mitchell was a full time resident of Keswick. His private room was, for all intents and purposes, his home. To be sure, persons may extend to intimate friends and relatives an open invitation to their homes, and may even desire them to enter unannounced, as Congressman Mitchell may have done. But, even in our most neighborly communities, it is not customary to enter another's home, uninvited and unannounced, without first being granted permission to do so. Moreover, an open invitation to friends and family members does not imply the grant of an

open invitation for other members of the community to enter at their will. *See Green v. Chicago Tribune Co.,* 286 Ill.App.3d 1, 221 Ill.Dec. 342, 675 N.E.2d 249 (1996) (holding, among other things, that statements made by a mother to her deceased son in a private hospital room and overheard by newspaper reporters, were not made in a public place to defeat the mother's privacy expectation and that "[t]he general public surely had no right to resort" there).

Our conclusion that it would not have been customary for Roche and Penn to enter Congressman Mitchell's private nursing room, unannounced and uninvited, is bolstered indirectly by the provisions established by the General Assembly in Maryland Code (1982, 2005 Repl.Vol.), §§ 19–342–345 of the Health General Article ("H.G."), also known as the "Nursing Home Resident's Bill of Rights." *See e.g., Oak Crest Village, Inc., v. Murphy,* 379 Md. 229, 240, 841 A.2d 816 (2004) (referring to, and discussing, the "Nursing Home Resident's Bill of Rights"). H.G. § 19–343(a) governs application of the Nursing Home Resident's Bill of Rights, and it brings within its scope "facilities" defined by the rules of the Department of Health and Mental Hygiene as "comprehensive care facilities." COMAR § 10.07.02.01(6) defines a "comprehensive care facility" as "a facility which admits patients suffering from disease or disabilities or advanced age, requiring medical service and nursing service rendered by or under the supervision of a registered nurse."

Clearly, Keswick was a comprehensive care facility at the time Congressman Mitchell was a resident, and thus, subject to the provisions of the Act. H.G. § 19–344 provides, in relevant part:

(o) *Privacy.*-(1) *A resident of a facility shall enjoy privacy in the room of the resident.*

(2) Unless the staff member knows that the resident is asleep, *the member shall knock on the door before the member enters the room of the resident.*

(Emphasis added).

Although we recognize that the provisions of the Nursing Home Resident's Bill of Rights apply to qualified care facilities

and their employees, we find the privacy provisions contained therein indicative of community values. Accordingly, we disagree with appellees' assertion that it was customary within the community to enter the private room of a nursing home resident unannounced and uninvited.

Moreover, consent implied through custom is only effective "in the absence of a posted notice or other manifestation to the contrary." *Restatement (Second) of Torts* § 892 cmt. d. Congressman Mitchell maintains that he asked the reporters to leave after they entered his room. Just as a hunter on private land could not reasonably assume consent to continue his pursuit of quarry after the owner of the land requests that he leave, appellees cannot avail themselves of the defense of implied consent on a motion for summary judgment where there is a dispute of material fact regarding whether Congressman Mitchell told them to leave his private nursing room.

### B. Implied Consent Through Acquiescence.

Appellees next argue that, because Congressman Mitchell answered their questions, he implicitly consented to their presence. In support of that argument, appellees cite, and the circuit court relied upon, *Machleder v. Diaz,* 538 F.Supp. 1364, (S.D.N.Y.1982), and *Reeves v. Fox Television Network,* 983 F.Supp. 703 (N.D.Ohio 1997), among others. None of these cases is controlling and we find them readily distinguishable from the present case.

In *Machleder,* an investigative television reporter inquired into how Flexcraft Industries disposed of certain chemicals used in its manufacturing processes. 538 F.Supp. at 1367. Pursuant to an anonymous tip, the reporter went to a lot adjacent to Flexcraft, where he saw several abandoned chemical barrels strewn about. Erroneously believing that the barrels were on Flexcraft property, the reporter and his crew approached the Flexcraft building.[2] Although it was disputed

---

**2.** In fact, the drums were not located on Flexcraft's property, but on property owned by the Newark Housing Authority. *Machleder,* 538 F.Supp. at 1367.

whether the reporter or the camera crew actually entered the facility, it was undisputed that the television crew filmed the inside of the plant. Upon seeing the television crew, Bruce Machleder, the manager's son, told them to stop filming. When he was asked about the chemical drums, Bruce Machleder directed the television crew to go to the office at the front of the building. While the crew were on their way to the office, the reporter witnessed Irving Machleder ("Machleder"), whom he correctly determined to be Flexcraft's manager, leaving the building. With his camera crew filming, the reporter approached Machleder and repeatedly questioned him about the discarded barrels. Although Machleder became visibly upset from the questioning and told the crew to stop filming, he did not tell the crew to leave the property, but instead retreated to his office and shut the door. *Id.*

Claiming later that Bruce Machleder authorized him to enter, the reporter followed Machleder into his office, where, upon further questioning, Machleder informed the reporter that he had notified the authorities of the abandoned barrels on the neighboring property. That evening the television station aired a segment in which the reporter explained the presence of the barrels and explained that Machleder had indeed informed the authorities about them. Machleder subsequently filed suit against the reporter and television station alleging, among other claims, trespass and intrusion upon seclusion. *Id.* at 1369.

Granting summary judgment on Machleder's trespass claim, the United States District Court for the Southern District of New York found that, "at no time did Bruce [Machleder] tell the [television crew] to leave the entire premises," and "[Machleder] did not tell [the] defendants to leave the property. To the contrary, at the close of the encounter, defendants were still able to obtain an interview with Bruce Machleder on Flexcraft property." *Id.* at 1375. Moreover, the District Court acknowledged that it was undisputed that Bruce Machleder told the news crew to go to the front of the building. According to the District Court, because neither Bruce nor Irving Machleder asked the reporter or his crew to leave the

property, but instead answered their questions and merely requested that the crew stop filming, their actions "constitute[d] implied permission to remain on the property," which precluded liability for trespass. *Id.*

In *Reeves,* an arrestee sued the producer of the television program "COPS," among others, after his arrest was depicted on an episode of that program. 983 F.Supp. at 707. Responding to a report that he was involved in an altercation with another man, police officers arrived at Reeves's home and knocked on his door. After several minutes, Reeves opened the door, whereupon one of the officers requested to come inside. Reeves eventually opened the door and allowed the officers to enter. Also present was a cameraman for the television show "COPS," who followed the officers into Reeves's home. *Id.*

Although he testified that he knew he was not required to let the officers into his home and that he saw the cameraman enter, Reeves "did not ask the police or the cameraman to leave his house or ask the cameraman to stop filming at any time during the encounter." *Id.* at 712. Considering the defendants' motion for summary judgment on Reeves's subsequent trespass claim, the United States District Court for the Northern District of Ohio held that "[b]oth the unedited videotape and the 'Cops' video segment confirm that [Reeves] voluntarily allowed the police and the cameraman to enter his home.... There is no evidence from the videotapes to indicate that [Reeves] did not willingly allow the police or the camera crew into his house." *Id.* The District Court was not persuaded that Reeves's consent resulted from duress or coercion. *Id.* at 712–714.

The United States Court of Appeals for the Fifth Circuit and the Court of Appeals of North Carolina relied upon similar reasoning to reach similar results in *Rawls v. Conde Nast Publ'ns, Inc.,* 446 F.2d 313 (5th Cir.1971), and *Broughton v. McClatchy Newspapers, Inc.,* 161 N.C.App. 20, 588 S.E.2d 20 (2003), respectively.

■ What appellees fail to recognize is that, unlike in *Machleder, Reeves, Rawls,* and *Broughton,* there is evidence in the present case, albeit his own deposition testimony and affidavit, that Congressman Mitchell asked the reporters to leave his room several times before responding to their questions. Assuming the truth of appellant's assertions, as required at the summary judgment stage, by continuing to stay after being asked to leave, the reporters exceeded the scope of any consent, even if the reporters did not commit a trespass in entering the room. *See Mistral, Inc. v. CBS,* 61 A.D.2d 491, 402 N.Y.S.2d 815 (1978) (upholding liability of television station for trespass where news crew was sent into a public restaurant with cameras "rolling" and failed to leave when the restaurant manager requested them to do so).

Although Congressman Mitchell may have answered their questions, viewing the facts and the inferences generated by those facts in the light most favorable to him as the non-moving party, a reasonable trier of fact could conclude that his responses to the reporters' questions were not given voluntarily, but rather were given in an effort to be rid of the two men who had entered his private nursing room uninvited and thereafter refused to leave. Moreover, a reasonable factfinder could conclude that the reporters could not reasonably have believed that Congressman Mitchell voluntarily responded to their questions or their presence. *See Restatement (Second) of Torts* § 892 (explaining that, in order to constitute implied or apparent consent, the words or conduct must be "reasonably understood by another to be intended as consent").

At oral argument, counsel for appellees maintained that any responsive answer given by Congressman Mitchell to the reporters' questions necessarily amounted to his consent to their presence. When questioned whether valid consent could be obtained by continually questioning the Congressman in his private room after the reporters' were repeatedly asked to leave, counsel for appellees maintained that, under those circumstances, the Congressman had no other recourse but to lie in his bed or sit in his chair and refuse to answer until such

time as the reporters' questioning constituted harassment. We disagree. Under those facts, which are in accord with Congressman Mitchell's deposition testimony, we are persuaded that his answering of the reporters' questions could not be "reasonably understood by [the reporters] to be intended as consent" to their presence or the interview. *Restatement (Second) of Torts* § 892. There is, therefore, a dispute of material fact concerning whether Congressman Mitchell consented to the interview.

### C. Express or Implied Consent by Simpson.

Appellees also argue that Simpson consented to their being present in Congressman Mitchell's room and that they had a right to rely on her consent. Specifically, appellees maintain that Simpson's failure to ask the reporters to leave and her reported thanking the reporters for visiting constituted implied and express consent.

Even if we assume that, as his private duty nurse, Simpson could effectively consent to the reporters' presence in Congressman Mitchell's private room, according to Congressman Mitchell, Simpson was not present when the reporters initially entered. He claims that Simpson did not arrive until after the reporters began asking questions, after one of the two men looked through his files, and after he repeatedly asked them to leave. Viewing the facts in the light most favorable to appellant, we are not persuaded that Simpson's silence and thankful farewell could reasonably be construed to constitute implied consent in the face of the Congressman's explicit directions for the reporters to leave his room.

### D. Crediting Congressman Mitchell's Testimony.

Appellees assert that, despite the standard of review for affirming the grant of a motion for summary judgment, we are not required to afford Congressman Mitchell's deposition testimony credit because "the documentary and other evidence tendered by the Congressman himself rendered this testimony both insubstantial and spurious." Specifically, appellees claim that, "until the day of his deposition, Congressman Mitchell

had never suggested to anyone [or included in his pleadings] that either reporter had rifled through anything during their visit with him at Keswick."

■ The function of the pleadings in a summary judgment case is to "frame the issues, with respect to which the court must determine materiality." *Vanhook v. Merchs. Mut. Ins. Co.*, 22 Md.App. 22, 27, 321 A.2d 540 (1974). There is no requirement, however, that a plaintiff allege each and every fact upon which his complaint is premised in his initial pleading. *See Davis v. DiPino*, 337 Md. 642, 648–49, 655 A.2d 401 (1995) (distinguishing between a motion for summary judgment and motion to dismiss). A litigant is similarly not required to report to his "closest confidants" all of the evidence upon which he or she will rely, or risk being denied the benefit of having the reviewing court view the evidence in the most favorable light.

Citing *Pittman v. Atlantic Realty, Inc.*, 359 Md. 513, 754 A.2d 1030 (2000), appellees also contend that Congressman Mitchell's testimony, "on its face, [was] so self-contradictory as to be absurd," and that "Maryland [ ] courts are empowered to disregard inherently incredible evidence on motions for summary judgment." In *Pittman*, a mother alleged that the residence at which her minor child had visited and resided for a period had caused elevated levels of lead in the child's blood. In her initial interrogatory answers, the mother indicated that the child had resided at the subject premises from 1992–93, and was cared for there on weekdays from 8:00 a.m. to 4:00 p.m. In her deposition testimony, the mother asserted that she and the child had only lived at the subject premises for two months and that the child was cared for there occasionally.

In his deposition, the plaintiff's expert explained that, based upon a two months' exposure to lead paint at the subject premises, it was "unlikely" that that location was a major contributor to the child's elevated lead levels. *Id.* at 522, 754 A.2d 1030. Accordingly, the defendants, the owner and manager of the subject premises, moved for summary judgment arguing that the plaintiff's and the plaintiff's expert's deposi-

tion testimony established that causation was unlikely given the child's two month residence at the subject premises.

In opposition to the defendant's motion for summary judgment, and more than one year after her deposition, the plaintiff filed an affidavit alleging that, from the time the child was born, she visited the subject premises with the child daily for approximately seven to eight hours. She also claimed that the she had lived there for approximately five and one-half months, and that, after she moved out, she continued to spend approximately eight hours a day there with the child. Based on the mother's newly stated residency and visitation periods, the plaintiff's expert also filed an affidavit explaining that the subject premises "was a substantial cause" of the child's elevated lead levels. *Id.* at 524, 754 A.2d 1030.

The defendant's moved to strike the affidavits, which the Circuit Court for Baltimore City granted, stating that the affidavits constituted "significant changes" and that "the process of discovery can become subverted ... if by the mere presentation of an affidavit constructed more than a year after the presentation of deposition testimony, a witness can so dramatically alter her evidence." *Id.* at 524–25, 754 A.2d 1030. As a consequence of striking the plaintiff's affidavits, the circuit court granted summary judgment in favor the defendants.

This Court affirmed, holding that the affidavits submitted after the conclusion of the discovery period constituted "unfair surprise." *Id.* at 526, 754 A.2d 1030. We adopted the "sham affidavit rule," created by federal case law, which precludes a party from defeating a motion for summary judgment by "offering an affidavit which contradicts unambiguous testimony previously elicited during a deposition." *Id.*

Granting *certiorari*, the Court of Appeals rejected the "sham affidavit rule," reasoning that the rule, in application, is contrary to the method in which Maryland courts have ruled on motions for summary judgment because it "requires a

credibility judgment by the trial court."[3] *Id.* at 535, 754 A.2d 1030. The Court, however, explained that Maryland courts are permitted to "disregard the otherwise admissible content of an affidavit in opposition to a motion for summary judgment," if the following test was satisfied:

[T]here are certain basic claims that witnesses make that are not provably false but are so wildly implausible and unbelievable that no rational jury would be allowed to return a verdict on the basis of such testimony. These consist of claims and defenses that "rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them," and they are no rarity in federal courts. For more than a century, our legal system has provided that a factual question will not reach a jury "merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." The judge cannot discharge that responsibility unless he is willing, when necessary, to reject even the sworn claims of an eyewitness that are literally incredible— even on a motion for summary judgment.

*Id.* at 538, 754 A.2d 1030 (quoting J.J. Duane, *The Four Greatest Myths About Summary Judgment,* 52 Wash. & Lee L.Rev. 1523, 1581–82 (1995)).

---

**3.** After *Pittman,* Maryland adopted Rule 2–501(e). Pursuant to that Rule, where a party offers a contradictory affidavit or statement subsequent to any prior sworn statement, the opposing party may file a motion to strike. Md. Rule 2–501(e)(1). Where the court finds that the affidavit or statement materially contradicts the prior sworn statement, the court shall strike the contradictory statement, unless

the court determines that (A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit or other statement is based on facts that were not known to the person and could not reasonably have been known to the person at the time the prior statement was made, or if the prior statement was made at a deposition, within the time allowed by Rule 2–415(d) for correcting the deposition.

Md. Rule 2–501(e)(2).

Applying that test to the affidavits submitted, the *Pittman* Court determined that, despite the contradictory assertions, it could not conclude "that a rational jury would reject as incredible the facts stated." *Pittman*, 359 Md. at 539, 754 A.2d 1030. Moreover, the Court opined that, because the Maryland Rules preclude a party from substantively amending deposition testimony, a party's departure from his or her deposition would likely occur for the first time at trial, where he or she would be subject to cross-examination and possible perjury charges. *Id.* at 539–43, 754 A.2d 1030.

 Unlike in *Pittman*, or a "sham affidavit case," the averments that appellees desire this Court to summarily discredit occurred in a deposition rather than an affidavit contradicting deposition testimony. And, although Congressman Mitchell's deposition testimony regarding his filing cabinet, table, or box, is somewhat contradictory, "[r]easonble persons, based on their real life experiences, may not be persuaded that [Congressman Mitchell's] failure to be consistent ... means that the testimony most favorable to [him] cannot be believed." *Id.* at 539, 754 A.2d 1030.

While the inconsistencies in the Congressman's version of events can certainly be raised during cross-examination and argued as reasons to disbelieve his testimony, viewing the evidence in a light most favorable to him, there is a dispute of material fact regarding whether one of the reporters looked through his files or papers, thereby exceeding the scope of the Congressman's consent, if any, to their presence. Accordingly, the circuit court erred in granting summary judgment on the trespass count.

## II.

Congressman Mitchell also asserts that the circuit court erred in granting appellee's motion for summary judgment on his intrusion upon seclusion claim. Specifically, he contends that the circuit court erred in concluding that he consented to the interview, creating an affirmative defense in favor of appellees.

 We have said that the " 'tort of invasion of privacy is not just one tort, but encompasses four different types of invasion tied together under one title. One form of invasion is intrusion upon the seclusion of another.' " *McCauley v. Suls*, 123 Md.App. 179, 190, 716 A.2d 1129 (1998) (citations omitted). Intrusion upon seclusion has been defined as: "The intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Furman v. Sheppard*, 130 Md.App. 67, 73, 744 A.2d 583 (2000). Intent is clearly required; " '[t]he tort cannot be committed by unintended conduct amounting merely to a lack of due care.' " *Bailer v. Erie Ins. Exchange*, 344 Md. 515, 527, 687 A.2d 1375 (1997) (citations omitted).

 In his complaint, Congressman Mitchell alleged that Roche and Penn "intentionally invaded the land, residence, and privacy," and "intentionally intruded and pried upon [his] solitude, seclusion, private affairs and/or concerns in a manner highly offensive to a reasonable person." In opposition to appellees' motion for summary judgment, Congressman Mitchell asserts that the reporters' refusal to leave his room after he requested that they do so evidences a malicious intent on their part to intrude upon his private affairs. We are persuaded that, if a fact-finder credited Congressman Mitchell's testimony, the reporters' intent to intrude upon Congressman Mitchell's solitude and private affairs could be implied through their refusal to leave and through their continued questioning. Similarly, under those facts, a reasonable fact-finder could conclude that the reporters' conduct occurring in his private nursing room was highly offensive. As a result, for the reasons stated above with regard to his trespass claim, we hold that there is a dispute of material fact regarding Congressman Mitchell's claim of intrusion upon seclusion that precludes a grant of summary judgement.

 Appellees concede "that the First Amendment [does not] immuniz[e] them from all liability for damages caused in the course of newsgathering," but assert that we "are obligated to construe [tort] causes of action narrowly in order to avoid a conflict with the constitutional principles that protect

speech and the press." Although, in some instances, it may be necessary to resolve questions of tort liability in favor of the news media to prevent chilling of First Amendment interests, the Supreme Court of the United States has opined that members of the media "ha[ve] no special privilege to invade the rights and liberties of others." *Associated Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103, 132–133, 57 S.Ct. 650, 81 L.Ed. 953 (1937). It is "well-established ... that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991).

Courts addressing intrusions by the media under similar facts have denied motions for summary judgment in subsequent trespass and privacy torts. In *Shulman v. Group W Prods., Inc.*, 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 955 P.2d 469 (1998), the Supreme Court of California denied the defendant television producer's motion for summary judgment on the plaintiffs' claims of intrusion upon seclusion. In that case, the plaintiffs, a mother and her son, were involved in a severe auto accident on a public highway necessitating their removal from the scene in a helicopter. Present in the helicopter was a cameraman for a television show "On Scene: Emergency Response." The cameraman filmed the performance of emergency services upon the mother and recorded statements she made to an emergency technician. As a result of the injuries sustained in the accident, the mother became a paraplegic. While recovering in the hospital, a local television station aired a program, showing, among other things, the events occurring in the mother's helicopter transport to the hospital. She filed a lawsuit against the television program's producers, among others, alleging intrusion upon seclusion.

On appeal from the trial court's grant of summary judgment in favor of the defendants, the Supreme Court of California reversed, explaining that, "[a]lthough the attendance of reporters and photographers at the scene of an accident is to be expected, we are aware of no law or custom permitting the

press to ride in ambulances or enter hospital rooms during treatment without the patient's consent." *Id.* at 490. The *Shulman* Court recognized that "the First Amendment does not immunize the press from liability for torts or crimes committed in an effort to gather news," and adopted a balancing test to determine whether a reporter's intrusion was "offensive." *Id.* at 493. Under that test, "courts must consider the extent to which the intrusion was, under the circumstances, justified by a legitimate motive for gathering the news ... [and] the particular method of investigation used." *Id.* at 493–94. The court opined that a "violation of well-established legal areas of physical or sensory privacy—trespass into a home ..., for example—could rarely, if ever, be justified by a reporter's need to get the story." *Id.* at 494. Finally, the *Shulman* Court explained that, unlike the tort of disclosure of private facts, the tort of intrusion upon seclusion presented less of a potential chilling effect on First Amendment freedoms because the press was not subject "to liability for the contents of its publications," but merely for the intrusive manner in which they chose to procure newsworthy information. *Id.* at 496. *Accord Green v. Chicago Tribune Co.*, 286 Ill.App.3d 1, 221 Ill.Dec. 342, 675 N.E.2d 249 (1996) (holding that the plaintiff's allegations were sufficient to state a claim for disclosure of private facts where reporters took photographs of the plaintiff's deceased son, obstructed her entry into her dead son's private hospital room, and thereafter recorded and reported her farewell statements to him); *Miller v. NBC*, 187 Cal.App.3d 1463, 232 Cal.Rptr. 668 (1986) (denying defendant television station's motion for summary judgment on trespass and intrusion upon seclusion claims, among others, where television crew, without consent, followed Fire Department paramedics when they entered the plaintiff's apartment, filmed unsuccessful attempts to resuscitate the plaintiff's husband, and subsequently used the film in nightly news segment).

## III.

Finally, Congressman Mitchell contends that the circuit court erred in granting appellees' motion for summary

judgment on his claim of intentional infliction of emotional distress. In order for a plaintiff to prevail on a claim of intentional infliction of emotional distress, " ' "(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe." ' " *Carter v. Aramark Sports and Entm't Serv's, Inc.*, 153 Md.App. 210, 245, 835 A.2d 262 (2003) (quoting *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95 (2000)). In addition, we have said that a complaint alleging intentional infliction of emotional distress must be pleaded with specificity. *Foor v. Juvenile Serv's Admin.*, 78 Md.App. 151, 175, 552 A.2d 947 (1989).

 In order to satisfy the element of extreme and outrageous conduct, the conduct "must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191 (1992) (quoting *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977)). Moreover, the emotional distress complained of must be so severe that "no reasonable man could be expected to endure it." *Harris*, 281 Md. at 571, 380 A.2d 611. "One must be unable to function; one must be unable to tend to necessary matters." *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 60–61, 502 A.2d 1057 (1986) (internal citations omitted).

 In the instant case, Congressman Mitchell alleges that Roche and Penn caused him severe emotional distress by "unlawfully, unethically, and immorally gaining access and trespassing into ... [his] private room ..., and, further, causing damage by staying in [his] room after requested to leave." We are not persuaded that the reporters' questioning of Mitchell, even if conducted while trespassing, exceeded "all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized society." *Batson*, 325 Md. at 733, 602 A.2d 1191.

Similarly, we are not persuaded that Congressman Mitchell alleges the severity of emotional distress necessary to state a claim. In his complaint and in opposition to appellees' motion for summary judgment, Congressman Mitchell alleged that the interview caused him "discomfort and disturbed the peace and [his] well-being." Such emotional distress is not so severe that "no reasonable man could be expected to endure it." *Harris*, 281 Md. at 571, 380 A.2d 611. As a result, the circuit court's grant of summary judgment with regard to this claim was appropriate.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**ONE–THIRD COSTS TO BE PAID BY APPELLANT AND TWO–THIRDS BY APPELLEES.**